[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
Plaintiffs-Appellants Barbara and Fred Pelletier appeal the trial court's grant of summary judgment to Defendant-Appellee Dayton Power Light Company (hereinafter "DPL"). The Pelletiers complaint alleged, inter alia, that DPL's negligence had caused Mrs. Pelletier to fall and suffer injuries, and that Mr. Pelletier had lost the consortium of Mrs. Pelletier as a result of her fall. In their two assignments of error, the Pelletiers claim the trial court erred in finding that reasonable minds could only conclude that (1) DPL exercised the highest degree of care with regard to Mrs. Pelletier, and (2) that DPL's employee's reliance upon a third party in exercising such care was reasonable and appropriate. For the reasons that follow, we reverse the judgment of the trial court.
 Construing the facts in a light most favorable to the Pelletiers, it appears that on April 1, 1997, Mrs. Pelletier visited Sue Barnard's gift shop, Sue's Treasures, in Tipp City, Ohio. Mrs. Barnard was not at the store that morning, however, and her husband, Leslie, was tending the shop. When Mrs. Pelletier arrived at the shop it was not yet open for business, so she waited in her car for a short time, noticing as she did so that a man with a clipboard also seemed to be waiting for the shop to open. At about 10:00a.m., Mr. Barnard unlocked the front door to the shop; Mrs. Pelletier approached him and the two had a short conversation about an item she had seen at the store on a previous visit. Mrs. Pelletier then entered the shop and began looking for the item on the display shelves.
Unbeknownst to Mrs. Pelletier, the man with the clipboard, DPL service technician Robert Rowland, also entered the shop so he could read the gas meter located in the basement of the building. To gain access to the basement, what, for want of a better term, we shall refer to as a trap door had to be raised from the floor. When opened, the trap door leaned against one of the walls in the shop and left in the floor an opening measuring forty by forty-two inches. Mr. Rowland lifted the trap door, warned Mr. Barnard that it was opened, and advised him to watch so that no one fell into the basement. At that time, Mr. Barnard was less than ten feet from the hole, and he acknowledged Mr. Rowland's warning. Mrs. Pelletier, on the other hand, was still near the front of the shop, approximately forty to fifty feet from Mr. Rowland, and did not hear his warning.
Mr. Rowland descended the steep wooden steps into the basement and checked the meters. He estimated the dimensions of the basement at approximately two-and-a-half or three feet by four-and-a-half or five feet. Before he could climb out of the basement, and after he had been in the basement less than a minute, Mrs. Pelletier fell through the hole left by the open trap door and landed at Mr. Rowland's feet. Mr. Barnard called 9-1-1, and Mrs. Pelletier was eventually lifted from the basement and transported to Stouder Memorial Hospital in Troy where she was treated for her injuries and released.
On May 29, 1998, the Pelletiers filed a lawsuit against DPL and Mrs. Barnard claiming personal injuries and Mr. Pelletier's loss of his wife's consortium.[1] DPL responded with an answer, and on August 9, 1999, filed a motion for summary judgment. The trial court granted DPL's motion finding (1) that DPL owed a duty of the highest degree of care to Mrs. Pelletier; (2) that Mr. Rowland exercised that degree of care in carrying out his duties on the day of Mrs. Pelletier's accident; and (3) that Mr. Rowland reasonably relied on Mr. Barnard to guard the hole for the short time Mr. Rowland planned to be in the basement. The trial court concluded that there is no genuine issue as to any material fact respecting whether DPL was negligent as a matter of law. The Pelletiers' timely notice of appeal followed.
The Pelletiers assert two assignments of error for our consideration. First, they contend the trial court erred in finding that DPL, through its employee Mr. Rowland, exercised the highest degree of care toward Mrs. Pelletier. Second, the Pelletiers claim error in the trial court's finding that Mr. Rowland reasonably relied upon Mr. Barnard to guard the hole in the floor left by the trap door.
As we consider the merits of the Pelletiers' assigned errors, we are mindful that an appellate court reviews a trial court's grant of summary judgment de novo. Grafton v. Ohio Edison Co.
(1996), 77 Ohio St.3d 102, 105. Whether summary judgment is appropriate hinges upon the movant's demonstration (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. Harless v. Willis DayWarehousing Co. (1978), 54 Ohio St.2d 64, 66; Civ.R. 56(C). In addition, the burdens placed upon both the movant and nonmovant in a motion for summary judgment are as follows:
 [A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(Exhibit) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.
Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. The court had previously held that "[a] motion for summary judgment forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production." Wing v. Anchor Media,Ltd. of Texas (1991), 59 Ohio St.3d 108, paragraph three of the syllabus. In Dresher, however, the court expressed a belief that its holding in Wing was too broad. Thus, after Dresher, a nonmovant is required to produce evidence only on those issues upon which the movant has sustained his or her initial burden as stated above. It is with these principles in mind that we approach the merits of the Pelletiers' two assignments of error.
 I. The trial court erred when it ruled that reasonable minds could only conclude that the Appellee exercised the highest degree of care owed to the Appellant when the Appellee failed to follow its own procedure for protecting confined spaces and failed to warn the Appellant of a known, foreseeable risk.
In their first assignment of error, the Pelletiers argue (1) that DPL owed Mrs. Pelletier "a duty of the highest degree of care"; (2) that the hole in the floor left by the opening of the trap door was a foreseeable danger; (3) that DPL failed to follow its own internal procedure respecting "confined spaces"; and (4) that DPL failed to warn Mrs. Pelletier about the danger presented by the open trap door. We will address each contention in turn.
First, we note that the Pelletiers' argument concerning the appropriate standard of care is unnecessary because the trial court found that "DPL owed a duty of the highest degree of care to Mrs. Pelletier, consistent with the practical operation of such business in the inspection of the electric [sic] meter." Docket No. 45 at 7-8. We also observe, however, that the trial court discussed the "duty of ordinary care" and "the higher standard of care" as if they were distinguishable creatures. Id. For more than a century, the degree of care required by law to be exercised by either party is "ordinary care and caution." Bellefontaine Ry.Co. v. Snyder (1874), 24 Ohio St. 670, 676. As that court explained,
 It is denominated `ordinary,' in the sense that it is such as persons of ordinary care and caution usually observe under like circumstances; and it is sometimes denominated the `highest' degree of care and caution, in the sense that persons of ordinary care and caution usually observe their highest degree of care and caution under such circumstances; that is, where human life is in peril.
Id. In other words, what constitutes "ordinary care" in a particular case will be commensurate with the danger involved. Therefore, the standard of care is always what is ordinary under the circumstances, but the amount of care required will vary from one set of circumstances to the next. In any case, DPL has not contested the trial court's finding that the duty DPL owed to Mrs. Pelletier required a very high degree of care.
Similarly, DPL does not dispute that the hole in the floor resulting from Mr. Rowland's raising of the trap door was a foreseeable danger. Thus, we need not address the Pelletiers' arguments on that issue.
Next, the Pelletiers argue that DPL breached its duty to Mrs. Pelletier by failing to follow its own internally-established procedures for protecting employees and others from the hazards of the open hole in the floor left by opening the trap door. DPL claims its policy relating to "confined spaces" does not apply to partial basements with trap door openings such as the one in Sue's Treasures. We note that the policy itself, though marked as an exhibit during depositions, was not included in the record. Both Mr. Rowland and his supervisor, Ross Collins, acknowledged in their depositions that the policy states in part as follows:
 When covers are removed from confined spaces, the opening shall be properly guarded by railings or other temporary barriers, such as a three-sided tubular metal barricade with the fourth side to be a detachable chain for entry and exit purposes to prevent accidental fall through the opening to protect employees working in the space and to prevent others from inadvertently entering the space.
Mr. Rowland testified, however, that the confined spaces policy did not pertain to basements and trap doors, and instead applied to man holes and holes in streets or sidewalks. He testified that "there's nothing other than common sense" to guide him or other DPL employees in protecting against accidental falls into basements through open trap doors. Similarly, Mr. Collins stated that he did not know whether DPL had defined "confined space," but that he considered regulator pit areas, vaults, and things of that nature to be "confined spaces." He added that he has never thought of a basement as being a "confined space," and stated that the policy consequently does not apply to basements with trap doors.
On its face, however, and without any evidence that "confined space" is a term of art in the industry or has been defined by DPL to exclude basement and trap door set-ups, we cannot conclude that the portion of the policy appearing in the record is inapplicable to the basement at Sue's Treasures. On the contrary, the basement and trap door arrangement at the shop seems to be precisely, though not exclusively, the type of situation the policy excerpt was intended to address. Even if that were not so, however, that the policy excerpt might not be applicable here does not inexorably lead us to the conclusion that DPL's duty of care owed to Mrs. Pelletier required nothing more than a word to the shopkeeper to watch the hole. While a hole in a sidewalk or street might pose greater danger to the public than a hole in the aisle of a shop, we cannot say the two are so dissimilar that the duty of care surrounding each is drastically different, especially when merchandise displays in shops are invariably calculated to draw customers' attention away from the bare floor in front of them.The trial court skirted the question of whether the policy applied to these facts by stating that even if it were applicable, that DPL did not follow the policy is not dispositive of whether it breached its duty to Mrs. Pelletier. We agree, but add that the policy excerpt reveals DPL's own internally-generated procedure for protecting its employees and others from the hazards accompanying an open hole above a confined space. By its very nature, the policy excerpt demonstrates the measures DPL believes are reasonable and effective means to meet its safety objective. While the policy does not define the duty DPL had to Mrs. Pelletier, it strongly suggests what types of measures it would be reasonable to expect DPL to take in discharging its duty to her, or in other words, what constitutes ordinary care under the circumstances. Furthermore, that DPL did not follow the safety procedures relating to confined spaces could go a long way toward establishing that it breached its duty of care toward Mrs. Pelletier.
In our view, and assuming DPL met its initial burden under Civ.R. 56(C), the Pelletiers have brought forth sufficient evidence to show that a genuine issue of material fact exists as to whether DPL exercised ordinary care toward Mrs. Pelletier. They presented via deposition DPL's safety policy relating to "confined spaces" which a jury might conclude is applicable to the basement and trap door located in Sue's Treasures. All witnesses present at the time of Mrs. Pelletier's accident agreed that the safety measures described in the policy were not followed in any way, nor were any orange warning cones placed around the hole, although Mr. Rowland acknowledged he had some cones in his truck that day and generally carries them with him. Viewing these facts in a light most favorable to the Pelletiers, we cannot say reasonable minds could only conclude that Mr. Rowland's warning to Mr. Barnard to watch the hole was sufficient for purposes of fulfilling DPL's duty of ordinary care owed to Mrs. Pelletier. Thus, the trial court erred in so finding.
In their final argument under their first assignment of error, the Pelletiers claim DPL failed to warn Mrs. Pelletier of the foreseeable risk posed by the open trap door. The trial court explicitly found the same to be true. Thus, we need not belabor the point here.
The Pelletiers also raise an issue concerning the trial court's finding that Mr. Rowland reasonably relied upon Mr. Barnard to guard the hole left by the trap door for the short time Mr. Rowland expected to be in the basement. The court stated as follows:
 As indicated, the procedure that had been used by the Barnard's [sic] and DPL over the years was that the DPL employee would warn the Barnards of the open hole, and they would stay in the vicinity to guard it. The fact that DPL utilizes this procedure does not necessarily mean it is reasonable and satisfies its duty of care to Mrs. Pelletier. However, it does demonstrate the reasonableness of Mr. Rowland's reliance upon Mr. Barnard; that Mr. Barnard could be relied on to guard the hole for less than thirty seconds. The Court finds that reasonable minds would conclude that Mr. Rowland reasonably relied on Mr. Barnard to guard the hole, [sic] for the less than thirty[-]second period it would take to descend into the hole to read the meter. (Cites to the record omitted.)
Docket No. 45 at 3-4. We find this passage somewhat cryptic in light of the court's ultimate conclusion that reasonable minds could only conclude that DPL satisfied its duty of care to Mrs. Pelletier, especially when it is recalled that Mr. Rowland's exclusive act toward discharging DPL's duty of care toward Mrs. Pelletier was his reliance on Mr. Barnard to guard the hole. Moreover, Mr. Barnard did not testify that it was his custom to guard the hole for the DPL employees who came to read the meters or perform other duties in the basement. That testimony was elicited from Mrs. Barnard, who was rarely, if ever, present in the store on those occasions when Mr. Barnard was tending the shop, and who was not present on the day of Mrs. Pelletier's accident. Consequently, we find that reasonable minds viewing the evidence in a light most favorable to the Pelletiers could disagree as to whether Mr. Rowland's reliance on Mr. Barnard was reasonable, or that that reliance alone, even if reasonable, satisfied DPL's duty to exercise ordinary care toward Mrs. Pelletier.
For the foregoing reasons, we sustain the Pelletiers' first assignment of error.
 II. The trial court erred in holding that the Appellee reasonably relied upon Mr. Barnard to protect the hole because the fact upon which said holding is based is disputed and the reasonableness of Appellee's conduct in delegating to Mr. Barnard the highest duty of care is a question of fact.
In their first argument under their second assignment of error, the Pelletiers expand upon the last argument of their first assignment of error, but provide no information that causes us to change our resolution of it as discussed above. Therefore, we need only address their second argument in which they contend the trial court erred in holding that DPL was permitted to delegate the duty of care it owed to Mrs. Pelletier to Mr. Barnard. The trial court's decision, however, does not contain any discussion of a delegation by DPL of its duty to Mrs. Pelletier. Instead, and as noted above, the court merely stated that Mr. Rowland reasonably relied upon Mr. Barnard to guard the hole for the short time Mr. Rowland was in the basement. We do not read this statement to be a categorical approval of DPL's alleged delegation of its duty of care to Mrs. Pelletier, nor do we understand it to mean that by so delegating, DPL would be permitted to insulate itself from liability for her injuries. Thus, we find the Pelletiers' claimed error to be meritless and to that extent, their second assignment of error is overruled.
Having sustained the Pelletiers' first assignment of error, and overruled their second, the judgment of the trial court granting summary judgment in favor of DPL is reversed, and this cause is remanded for further proceedings according to law.
GRADY, P.J. and GLASSER, J., concur.
(Hon. George M. Glasser sitting by assignment of the Chief Justice of the Supreme Court of Ohio).
[1] Since this appeal concerns only the Pelletiers' claims against DPL, we will confine our summary of the procedural history of the case to the documents pertinent to those claims.